UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRIAN DUDLEY,

                            Plaintiff,

            v.

NEW YORK CITY HOUSING
AUTHORITY, BOB MARANO, IRENE
SHAPIRO, JONATHAN WASSERMAN,
and PETER QUERCIA, individually and in
their official capacity,

                            Defendants.

**MEMORANDUM
OPINION & ORDER**

14 Civ. 5116 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

            Plaintiff Brian Dudley brings this action against his former employer, Defendant

New York City Housing Authority ("NYCHA"), and four of his supervisors – Defendants Bob

Marano, Irene Shapiro, Jonathan Wasserman, and Peter Quercia – pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; the New York State Human Rights

Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; the New York City Human Rights Law

("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.; and the Family and Medical Leave Act

("FMLA"), 29 U.S.C. § 2601 et seq. Plaintiff contends that Defendants discriminated against

him, and subjected him to a hostile work environment, based on his race and disability, and

retaliated against him after he complained about this discrimination. (See Cmplt. (Dkt. No. 2))

Plaintiff also contends that Defendants interfered with his rights under the FMLA. (Id.)

            Defendants have moved for summary judgment on all of Plaintiff's claims.

(Notice of Motion (Dkt. No. 47)) For the reasons stated below, Defendants' motion will be

granted as to Plaintiff's Title VII, ADA, and FMLA claims, and as to his claims under the

NYSHRL for hostile work environment and retaliation. The Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL disability discrimination claim and NYCHRL claims, and those claims will be dismissed without prejudice.

**BACKGROUND**

## I.   FACTS[1]

### A.   The Parties

Plaintiff is an African-American male who worked for Defendant New York City Housing Authority from 2000 until his termination on January 3, 2014. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 8, 196) Plaintiff worked for various departments within NYCHA's information technology ("IT") division, including the Business Solutions Technology Department (the "BST") from 2007 to January 2012, and the Process and Information Management Department (the "PIM") from January 2012 until his termination. (Id. ¶ 10; Def. R. 56.1 Appx., Ex. 3 (Human Resources Record) (Dkt. No. 49-2)) The claims at issue in this litigation arise from Plaintiff's tenure at the PIM.

Defendant Bob Marano served as Vice President of the BST from 2007 to 2013. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 2; Def. R. 56.1 Appx., Ex. 5 (Marano Dep.)

---

[1] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where Plaintiff disputes Defendants' characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on Plaintiff's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

(Dkt. No. 49-5) at 6-7)[2] Marano supervised Plaintiff when he was assigned to the BST. (See Def. R. 56.1 Appx., Ex. 5 (Marano Dep.) (Dkt. No. 49-5) at 6-7) Marano did not have direct supervisory authority over Plaintiff after he transferred to the PIM, however.[3] (See id. at 12, 17)

Defendant Irene Shapiro has served as the Senior Director of the PIM since 2006, and has supervisory authority over the PIM. (Id. at 6; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 5) Shapiro reported to Marano during the time he served as Vice President of the BST. (Def. R. 56.1 Appx., Ex. 5 (Marano Dep.) (Dkt. No. 49-5) at 12; id., Ex. 6 (Shapiro Dep.) (Dkt. No. 49-5) at 12-13)

Defendant Jonathan Wasserman has served as Deputy Director of the PIM since 2002, and reports directly to Shapiro. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 6)

Defendant Peter Quercia has served as Assistant Director of the PIM since March 2010, and reports directly to Wasserman and indirectly to Shapiro. (Id. ¶ 7) Quercia served as Plaintiff's direct supervisor at the PIM, but Shapiro and Wasserman also supervised Plaintiff with respect to specific assignments. (Id. ¶ 11)

**B.  Plaintiff's Tenure at the BST and His 2012 Lawsuit Against NYCHA**

Plaintiff holds a bachelor's degree in computer science and a master's degree in information management. He was hired by NYCHA in 2000 as a Computer Associate, Level III. (Id. ¶¶ 8, 30-31) In 2005, Plaintiff was promoted to the position of Computer Specialist

---

[2] Except as to deposition transcripts, all citations in this Order reflect page numbers assigned by this District's Electronic Case Filing system. Citations to deposition transcripts reflect the page numbers assigned by the court reporter.

[3] Irene Shapiro – who served as Senior Director of the PIM – reported to Marano, however. (Pltf. Aff., Ex. D (Marano Dep.) (Dkt. No. 53-5) at 12-13) Moreover, Marano assigned work to Shapiro and received status updates concerning those assignments during biweekly meetings. (Id.) At these meetings, Shapiro sometimes provided information to Marano about Plaintiff. (See id. at 13)

(Software), Level I, after passing the relevant civil service exam, and in 2007, he was assigned to work in the BST in that capacity. (Id. ¶¶ 9-10)

Within NYCHA's IT division, the BST is responsible for the development and maintenance of NYCHA's computer and web applications. (See Def. R. 56.1 Appx., Ex. 7 (Wasserman Dep.) (Dkt. No. 49-5) at 27-28) As a Computer Specialist in the BST, Plaintiff's job responsibilities included programming tasks relating to the creation, development, and updating of various NYCHA applications. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 44; Def. R. 56.1 Appx., Ex. 20 (BST Job Description) (Dkt. No. 49-8) at 30-31)

Plaintiff's supervisors at the BST consistently deemed his job performance to be unsatisfactory. Plaintiff was issued more than 28 counseling and instructional memoranda,[4] and was the subject of three disciplinary hearings, based on his poor work product and misconduct. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 14; Def. R. 56.1 Appx., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-10) at 55-56)

Plaintiff claimed that these adverse employment actions – as well as other instances of allegedly unfavorable treatment by his BST supervisors – were the product of race and disability discrimination, and retaliation after he complained about discrimination. (See Def. R. 56.1 Appx., Ex. 13 (2012 Complaint) (Dkt. No. 49-6)) In late 2010 or early 2011, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission

---

[4] Counseling and instructional memoranda are tools used by NYCHA management "to make certain that an employee understands what is expected of him or her; to put an employee on notice of poor performance or misconduct; to make a record of a particular type of event or occurrence; or to serve as part of a process toward imposing disciplinary penalties." (Def. R. 56.1 Appx., Ex. 39 (HR Memo) (Dkt. No. 49-9)) Instructional memoranda provide written instructions to an employee, while counseling memoranda document particular events or conduct that may be construed as misconduct or incompetent performance. (Id.) Counseling memoranda typically become part of the employee's official record and "may serve as important evidence during a disciplinary proceeding" against an employee. (Id.)

("EEOC"). (Id., Ex. 14 (Dkt. No. 49-6) at 67)  The EEOC issued Plaintiff a Right to Sue Letter on January 11, 2012, and on April 10, 2012, Plaintiff commenced a lawsuit against NYCHA and his BST supervisors – Yehuda Gelbfish, Krzysztof Orlowski, and Marano – in the Southern District of New York. (Id., Ex. 13 (2012 Complaint) (Dkt. No. 49-6))

That lawsuit, Dudley v. New York City Housing Authority, No. 12 Civ. 2771 (PGG) ("Dudley I"), addressed conduct that took place between 2009 and June 4, 2012.  See 2014 WL 5003799 at *2, 17.  Plaintiff claimed that NYCHA and his supervisors had discriminated against him on the basis of race and disability, and retaliated against him, in violation of Title VII, the NYSHRL, the NYCHRL, and the ADA. See id. at *1.

On September 30, 2014, this Court granted defendants summary judgment on all of Plaintiff's claims.  See id.  With respect to Plaintiff's race discrimination, hostile work environment, and retaliation claims, this Court concluded, inter alia, that defendants had "demonstrated that the disciplinary actions against Dudley were taken in response to a well-documented history of absences, tardiness, and deficiencies in his work performance," and that Plaintiff had not demonstrated a causal connection between these disciplinary actions and protected activity giving rise to an inference of retaliation.  Id. at *24, 30.  Plaintiff did not appeal this Court's judgment.

C.    **Plaintiff's Reassignment to the PIM**

1.    **Plaintiff's January 2012 Transfer**

In late 2011 – after Plaintiff filed his EEOC complaint against his BST supervisors – he requested a transfer to a different position within the BST, where he would report to different supervisors. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 20-21; Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 113-115; Pltf. Aff. (Dkt. No. 53) ¶ 5)

Due to staffing needs, however, Plaintiff was transferred to the PIM instead. (See Def. R. 56.1 Appx. (Dkt. No. 49), Ex. 5 (Marano Dep.) at 7; id., Ex. 6 (Shapiro Dep.) at 20; id., Ex. 7 (Wasserman Dep.) at 18) The PIM is responsible for records management, forms automation, and several IT applications, including a printing and mailing system called NeoPost. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 19) Although PIM employees perform less programming than BST employees, at that time PIM needed staff with programming experience to help update the Forms and Reference Library, which is a searchable collection of PDF forms and other official NYCHA documents accessible to NYCHA employees through the agency's intranet webpage. (Id. ¶¶ 19, 68; Def. R. 56.1 Appx., Ex. 6 (Shapiro Dep.) (Dkt. No. 49-5) at 24)

In December 2011, Glenn Davis of NYCHA's Human Resources Department met with Plaintiff's soon-to-be new supervisors – Defendants Shapiro, Wasserman, and Quercia – and with his old supervisors in the BST, Gelbfish and Orlowski. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 23) Davis told the group that Plaintiff would be transferred to the PIM. Davis further instructed that while "there were some outstanding issues with [Plaintiff] and HR and the law department, . . . [Plaintiff] was to be given a clean slate and treated as any new employee." (Def. R. 56.1 Appx., Ex. 7 (Wasserman Dep.) (Dkt. No. 49-5) at 18) At the meeting, the attendees discussed Plaintiff's qualifications to confirm that "the fit was right." (Id., Ex. 6 (Shapiro Dep.) (Dkt. No. 49-5) at 21) Gelbfish told the PIM supervisors that Plaintiff "did some programming work." (See id. at 23-24) Davis asked the PIM supervisors to draft a job description to be shared with Plaintiff and his union representatives. (Id. at 22-23)

Shapiro – with input from Wasserman and Quercia – then created a job description for Plaintiff's potential position as a Computer Specialist (Software), Level I, within the PIM. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 27-28) The job description lists

6

Plaintiff's responsibilities and sets forth how his time would be allocated: "[m]onitor and ensure operation of NeoPost application" (30% of Time); "[t]roubleshoot and resolve issues related to NeoPost application" (20% of Time); "[m]aintenance of Trintech (Movaris) user accounts" (15% of Time); "[m]ake programmatic changes to the Forms and Reference Application," which includes "creating new modules and possible redesign/programming of the application to meet new specifications" (15% of Time); "[a]dd and remove content to/from the Forms and Reference Application" (10% of Time); and "[c]reate and modify Trintech (Movaris) forms and associated workflows" (10% of Time). (See Def. R. 56.1 Appx., Ex. 21 (PIM Job Description) (Dkt. No. 49-8) at 35)

In early January 2012, Plaintiff reviewed the proposed job description with Davis and Plaintiff's union representative. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 22, 27-28) At that time, Plaintiff did not express any concern about his ability to complete the assigned job responsibilities. (See id. ¶ 29; Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 155)

On January 11, 2012, Plaintiff agreed to be reassigned to the PIM. (Def. R. 56.1 Appx., Ex. 19 (Transfer Stipulation) (Dkt. No. 49-8) at 24; Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 10)[5] Plaintiff's transfer to the PIM became effective on January 17, 2012. (Def. R. 56.1 Appx., Ex. 19 (Transfer Stipulation) (Dkt. No. 49-8) at 26)

### 2. The Supervisors' January 2012 Meeting with Tamarkin

In January 2012, after the decision was made to transfer Plaintiff to the PIM, Wasserman and Quercia met with Arkadiy Tamarkin, who worked as a Computer Specialist

---

[5] Plaintiff's reassignment to the PIM was memorialized in a February 6, 2012 stipulation of settlement that resolved two grievances Plaintiff's union had filed on his behalf in 2011. (See Def. R. 56.1 Appx., Ex. 19 (Transfer Stipulation) (Dkt. No. 49-8)) The grievances did not involve claims of employment discrimination.

(Software), Level II, within the PIM. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 133-134, 142) At that time, Tamarkin's job responsibilities included updating forms and other content available in the Forms and Reference Library. (Id. ¶ 75)

During the meeting, Wasserman informed Tamarkin that he would be "handing over [to Dudley] the responsibility of [updating] postings to the [F]orms and [R]eference [L]ibrary," and that Tamarkin should train Dudley on how to complete that task once Dudley arrived at the PIM. (Def. R. 56.1 Appx., Ex. 7 (Wasserman Dep.) (Dkt. No. 49-5) at 39; see also id., Ex. 6 (Shapiro Dep.) (Dkt. No. 49-5) at 30-31; Quercia Decl. (Dkt. 49-11) ¶ 19) Although Wasserman asked Tamarkin to supervise Plaintiff's work on this task, Tamarkin declined that request. (Quercia Decl. (Dkt. No. 49-11) ¶ 19) According to Defendants, Wasserman and Quercia did not discuss with Tamarkin Plaintiff's EEOC complaint or any other complaints he had made.[6] (Id.)

At his deposition, Tamarkin testified that, during the meeting with Wasserman and Quercia, Wasserman offered to promote him to a supervisory role in exchange for his agreement to supervise Plaintiff and to report back "information" concerning Plaintiff:

Q.      Did they indicate who they were looking to promote you to supervise?

A.      Yes.

Q.      Who?

A.      Brian [Dudley].

Q.      What did they say about Brian [Dudley] or your role in supervision?

A.      Basically they repeat what I already knew.

---

[6] Plaintiff had not yet filed his lawsuit against NYCHA, Gelbfish, Orlowski, and Marano. That lawsuit was filed on April 10, 2012. (Def. R. 56.1 Appx., Ex. 13 (2012 Complaint) (Dkt. No. 49-6))

8

Q.   What was that?

A.   That I have to be very careful because person could manipulate my mind, and they need like information. In very gentle speech, they said the person is not so good. They said the person is not so good, and they need information.

(Def. R. 56.1 Appx., Ex. 12 (Tamarkin Dep.) (Dkt. No. 49-6) at 24)[7]  Tamarkin did not explain the nature of the requested information. Tamarkin further testified that "[w]hen [he got] home [after the meeting], [he] just thought it [was] wrong," and the "[n]ext day" he "polite[ly]" told Wasserman and Quercia that he was "not [a] good person for th[e] role." (Id. at 25)

Plaintiff testified that – in late December 2011 or January 2012, prior to his transfer to the PIM – Glenn Davis of NYCHA's Human Resources Department told Plaintiff that NYCHA's "management is upset" about his prior complaints, that NYCHA "was going to get rid of [him]," that Davis "d[id]n't know what [Plaintiff would] have to do to rectify the situation," and that Plaintiff should "do a Hail Mary." (Pltf. Aff., Ex. A (Pltf. Dep.) (Dkt. No. 53-2) at 295, 327-330; Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-4) at 108-109)  Plaintiff understood

_____

[7]  Tamarkin immigrated to the United States from the Soviet Union (see Def. R. 56.1 Appx., Ex. 12 (Tamarkin Dep.) (Dkt. No. 49-6) at 12), and the deposition transcript indicates that he has broken English.

During his deposition, Tamarkin stated that he suffered from "severe depression," "panic attacks," "sleeplessness," and "insomnia." (Id. at 5-6)  Although Tamarkin had left NYCHA for another job at the time of his deposition, he expressed great concern about "retaliation against [him]," and about the "well-being of [his] family," as a result of his deposition testimony and if his participation in the instant lawsuit became public. (Id. at 6-8, 11-14)  Tamarkin explained that he "came from [a] country that when [a] person was against [the] system . . . there was retaliation." (Id. at 12)  At one point, Tamarkin expressed concern that "[i]f as a result of this conversation something happen to me because my last thoughts are to commit suicide, if I do something, all my records will be available to the public." (Id. at 9)

Defense counsel objected to proceeding with the deposition. (Id. at 9, 14)  Tamarkin said that he would answer questions, however, because he "wanted to be done [with the matter] as soon as possible," to "be left alone," and to "get rid of NYCHA and forget what happened with NYCHA." (Id. at 13-15)  The ensuing deposition was brief, and defense counsel did not cross-examine Tamarkin.

Davis's reference to a "Hail Mary" to mean that NYCHA viewed Plaintiff as a "troublemaker," and that Plaintiff should "[a]sk[] for forgiveness."[8] (Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-4) at 330)

### 3.    Allegations of Hostile Work Environment

Plaintiff claims that he was subjected to harassment and abuse by his PIM supervisors in retaliation for his prior complaints and first lawsuit against NYCHA. (See Pltf. Aff. (Dkt. No. 53) ¶ 6, Ex. A at 105-108)

According to Plaintiff, from his arrival at the PIM, Wasserman gave him "demeaning looks" – that is, "a look of staring, like [he was] angry at [him]" – and would ignore and not speak with Plaintiff. (Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-4) at 276-277) Shapiro would "yell [at him] and scream[,] 'you're not doing your job.'" Dudley claims that his "similarly situated coworkers who had not complained about discrimination" were not subjected to this treatment. (Id. at 106; Pltf. Aff. (Dkt. No. 53) ¶ 6) Plaintiff also testified that during an October 2, 2012 meeting, Wasserman told him to "shut up."[9] (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 111)

---

[8] Plaintiff also testified that – soon after he began working at the PIM – Tamarkin told him about his January 2012 meeting with Wasserman and Quercia. (Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-4) at 288, 293-294, 298) According to Plaintiff, Tamarkin told him that the PIM supervisors "were after [him]," and that "they wanted . . . Tamarkin to write [him] up on anything, but [Tamarkin] refused to." (Id. at 288; see also id. at 293 ("[a]ny little thing you do, they're going to write you up")) Tamarkin's speculation about what future action the PIM supervisors might take against Plaintiff, and Plaintiff's hearsay testimony about what the PIM supervisors allegedly told Tamarkin they wanted, is not admissible. Because "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment," see Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009), this Court has not considered these statements in resolving Defendants' motion.

[9] On March 6, 2013, approximately five months after Wasserman told Plaintiff to "shut up," Plaintiff submitted a Violence Against Employees Report about the incident to Marano and the NYCHA Office for Safety and Security. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 112-113; Def. R. 56.1 Appx., Ex. 46 (Violence Against Employees Report) (Dkt. No. 49-9) at 56)

Plaintiff also testified that Quercia "overscrutinize[d] his work" and monitored Plaintiff's whereabouts and progress throughout the work day, including "check[ing] throughout the cubicles all day to make sure [that Plaintiff] was seated at all times" and requiring Plaintiff to notify him if he went to the restroom. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 120-121; Pltf. Aff. (Dkt. No. 53) ¶ 6; Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 107) Plaintiff testified that Quercia would also look in the restroom for Plaintiff when he was not at his desk. (Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 106-107) Plaintiff claims that his co-workers were not similarly treated. (Pltf. Aff. (Dkt. No. 53) ¶ 6)

Plaintiff further testified that his supervisors retaliated against him by "[g]iving [him] job assignments without training" or "mentoring," assignments with "[un]realistic time frame[s] [for] complet[ion]," and "assignments [that] they knew [he] would fail [at]." (Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 112-113, 152-153) Plaintiff contends that Defendants "set [him] up to fail" and, through negative performance evaluations, sought to generate a "paper trail . . . to effectuate their retaliatory dismissal of [Plaintiff]" based on his prior complaints of discrimination. (See Pltf. Aff. (Dkt. No. 53) ¶¶ 11, 16, 20)

### D.    Plaintiff's Job Performance at the PIM

#### 1.    Job Responsibilities

Plaintiff's job responsibilities at the PIM included (1) monitoring the NeoPost print queue, and (2) modifying the Forms and Reference Library. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 61, 70)

---

Marano referred the matter to the NYCHA departments responsible for addressing such reports. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 114-115) No action was taken, however, and Plaintiff did not follow up on his report. (See id. ¶ 116)

NeoPost is a computer application that processes customized documents for NYCHA tenants and prints them for mailing. (Id. ¶ 60) Upon joining the PIM, Plaintiff was tasked with monitoring the NeoPost printing queue and ensuring that the system did not crash or otherwise create printing backlogs due to errors. (Id. ¶ 61) Monitoring NeoPost required Plaintiff to periodically check the printing queue status bar on his computer screen, and did not require any coding or programming or preclude him from working on other tasks. (Id. ¶ 62) Plaintiff admits that monitoring the NeoPost queue was within his job description. (Id. ¶ 104) Shapiro supervised Plaintiff's monitoring of NeoPost. (Id. ¶ 63)

The Forms and Reference Library is a searchable collection of PDF forms, manuals, and other official NYCHA documents that is accessible to NYCHA employees through the agency's intranet webpage. (Id. ¶ 68) Prior to Plaintiff's transfer in January 2012, the PIM received a request to modify the Forms and Reference Library in order to make the documents more accessible to NYCHA employees. (Id. ¶ 69) At the time of the transfer, it was understood that Plaintiff would work on the Forms and Reference Library project by, inter alia, modifying the application's coding and updating the Library's forms and other content. (See Def. R. 56.1 Appx., Ex. 21 (PIM Job Description) (Dkt. No. 49-8) at 35) Although Quercia was Plaintiff's direct supervisor in the PIM, Wasserman supervised Plaintiff's work on the Forms and Reference Library. (Pltf. Resp. to Def. R. 56.1 Smt. (Dkt. No. 52) ¶ 72)

### 2. Plaintiff's Initial Assignments Concerning Updates to the Forms and Reference Library

Upon his transfer to the PIM in January 2012, Wasserman instructed Plaintiff to review the code for the Forms and Reference Library and decide whether he needed additional training in order to update the application. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 46, 81) Plaintiff reviewed the code in printed hard copy that had been provided to him by Warren

Kelley, another Computer Specialist in the PIM, who had performed smaller modifications to the Forms and Reference Library. Plaintiff did not view the code within the system, however. (Id. ¶¶ 75, 95, 134) Over the next four months, Plaintiff reported at weekly staff meetings that he was reviewing the code, and had no concerns and had experienced no difficulties. (Id. ¶ 82; Def. R. 56.1 Appx., Ex. 41 (Apr. 27, 2012 Counseling Memo) (Dkt. No. 49-9) at 10)

On April 24, 2012, Wasserman asked Plaintiff to prepare a "preliminary project plan" for the update to the Forms and Reference Library. Wasserman asked Plaintiff to submit the project plan on April 30, 2012. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 83) A preliminary project plan sets forth, in general terms, the steps to be taken to complete a project; it does not entail any actual coding or programming. (Id. ¶¶ 71, 84) Wasserman gave the assignment with the understanding that the preliminary project plan would be modified after Plaintiff completed additional training. (Id. ¶ 83)

On April 26, 2012, Plaintiff sent a memo to Wasserman and Quercia stating that it would be "difficult" for him to create a project plan within the timeframe given and outlining certain challenges he faced, including that the Forms and Reference Library was written in "Visual Basic.Net," a programming language which Plaintiff claimed to "have no knowledge of, even on an elementary level." (Def. R. 56.1 Appx. (Dkt. No. 49) Exs. 37, 38)

On April 27, 2012, Wasserman issued Plaintiff a counseling memorandum stating, inter alia, that NYCHA sent Plaintiff to a four-day training in Visual Basic.Net in 2007, and that Plaintiff should have raised his concerns during the four months that he had spent reviewing the code in the Forms and Reference Library. (Id., Ex. 41 (Apr. 27, 2012 Counseling Memo) (Dkt. No. 49-9) at 10-11) Wasserman's memorandum further states that "[e]ither you are being insubordinate by refusing to perform the current assignment or you have no

understanding of Virtual Basic code and were, therefore, pretending to work when you claimed to be analyzing the code for the past four months; both scenarios are unacceptable." (Id.)

In a rebuttal submitted that same day, Plaintiff states that on February 21, 2012, he had requested assistance and asked to be enrolled in training courses, including a course entitled ".Net Best Practices and Design Patterns (Hands On)."[10] (Id., Ex. 38 (Apr. 27, 2012 Pltf. Rebuttal) (Dkt. No. 49-8) at 174) In his rebuttal, Plaintiff also claims that his supervisors made "false promises" about the resources he would be given to complete the project. (Id.)

Wasserman later gave Plaintiff a revised due date of May 20, 2012, for the assignment, and Plaintiff ultimately submitted a preliminary project plan that was satisfactory. (See id., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-10) at 50)

### 3. June 1, 2012 NeoPost Backlog

On June 1, 2012, while Shapiro was out of the office, the NeoPost printing queue became backed up and shut down for approximately two hours. (Id., Ex. 6 (Shapiro Dep.) (Dkt. No. 49-5) at 41; id., Ex. 40 (June 4, 2012 Counseling Memo) (Dkt. No. 49-9)) Shapiro received

---

[10] On April 9, 2012, Wasserman had approved Plaintiff for enrollment in that training course, as well as an additional training course in "ASP.Net," which is a "script engine" supporting programming languages such as Visual Basic.Net, and which is used to generate and develop webpages. (See Def. R. 56.1 Appx., Ex. 27 (Training Approval) (Dkt. No. 49-8) at 125; id., Ex. 29 (Background on ASP) (Dkt. No. 49-8) at 139)

Plaintiff was scheduled to take the two training courses in August and September 2012. (See id., Ex. 26 (Feb. 26, 2013 Instructional Memo) (Dkt. No. 49-8) at 103-104) At the start of the first scheduled course – ".Net Best Practices and Design Patterns (Hands On)" – Plaintiff refused to take the course, stating that he needed to take a prerequisite course, "503 Visual Basic Programming for .NET: Hands On." (Id. at 104) Plaintiff's supervisors told Dudley that, based on his prior work experience and training, he "did not or should not need th[e] prerequisite course." They nonetheless approved Plaintiff for enrollment. (Id.)

Plaintiff's participation in the prerequisite training course was twice postponed in October 2012, initially due to Plaintiff calling in sick, and later because of Hurricane Sandy. (Id.; see also Pltf. Aff. (Dkt. No. 53) ¶ 7) Plaintiff ultimately asked to cancel the training in Visual Basic.Net and to be enrolled in training for other technologies. (See Def. R. 56.1 Appx. (Dkt. No. 49) Ex. 26 (Feb. 26, 2013 Instructional Memo) at 103-104; id., Ex. 50 (Oct. 23, 2012 Email))

a telephone call about the problem when she returned to her desk later that day, and she fixed the problem within fifteen minutes. (Id.) According to Shapiro, however, Plaintiff had been trained on how to monitor the NeoPost status bar, and it was his responsibility to do so "at a minimum every 15 minutes." (Id.) Plaintiff did not alert Shapiro or any other PIM employee to the problem, however. (See id.) On June 4, 2012, Shapiro issued a counseling memorandum to Plaintiff documenting the "gross dereliction of [his] responsibilities." (Id., Ex. 40 (June 4, 2012 Counseling Memo) (Dkt. No. 49-5))

Plaintiff contends, however, that Shapiro "fabricated" the incident and that "when [he] asked [her] to show [him] evidence [that] the issue . . . existed, she could not." (Pltf. Aff. (Dkt. No. 53) ¶ 11) Plaintiff also claims that there is a NeoPost "contact list" that notifies people directly in the event that issues with the application arise, but that he was not placed on that list and did not receive a call about any problems. (Id.) Plaintiff argues that the "failure to put [him] on th[e] contact list . . . [shows how his supervisors] set [him] up to fail." (Id.)

### 4. Plaintiff's Later Work Product Concerning the Forms and Reference Library

On October 19, 2012, Wasserman directed Plaintiff to prepare a "design document" for the project to update the Forms and Reference Library. (Def. R. 56.1 Appx., Ex. 35 (Dkt. No. 49-8) at 163) A design document describes the existing web application and sets forth in detail the steps for implementing the modifications to the application requested by a client. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 72) Wasserman gave Plaintiff a step-by-step timetable for completing the assignment, and set a final due date of November 20, 2012. (Def. R. 56.1 Appx., Ex. 35 (Dkt. No. 49-8) at 163) According to Wasserman, the project entailed only "small changes" to the Forms and Reference Library, and required only "six days" of work. (See id., Ex. 15 (Wasserman Sec. 75 Testimony) (Dkt. No. 49-7) at 33, 36)

Despite numerous extensions, supervisory meetings, and an instructional memorandum, Plaintiff's six drafts of the design document were each inadequate and did not conform to the instructions and specifications provided. (See id., Ex. 35 (Dkt. No. 49-8) at 163-167; see also id., Ex. 7 (Wasserman Dep.) at 97-100; id., Ex. 8 (Quercia Dep.) at 80-82) Plaintiff submitted a final version of the design document on January 17, 2013 – nearly two months after the original deadline – which was still inadequate. (Id., Ex. 35 (Dkt. No. 49-8) at 163) In order to meet the deadline for submitting the design plan for review by NYCHA management, Wasserman had to write the design document himself. Wasserman completed the design document in four hours and without using any of Plaintiff's work product. (Id.; see also Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 90)

On March 1, 2013, Wasserman issued a lengthy counseling memorandum detailing Plaintiff's poor work performance in connection with the design plan assignment. (See Def. R. 56.1 Appx., Ex. 35 (Mar. 1, 2013 Counseling Memo) (Dkt. No. 49-8) at 163-167) Wasserman's memorandum states:

> You have repeatedly failed to comply with specific directions by either submitting unacceptable and unsatisfactory work product or by not submitting any work product at all. Nearly two months after the assignment was initially due, you had still failed to provide a work product in a form that we could present to our client. Not making deadlines is unacceptable and will not be tolerated. This type of behavior undermines the work of this department, and thereby its ability to serve our clients. For all current and future assignments you must follow instructions as provided and meet deadlines as given.

(Id. at 167)

Plaintiff contends, however, that Wasserman's counseling memorandum "misrepresents the . . . reality of the situation." (Pltf. Aff. (Dkt. No. 53) ¶ 24) According to Plaintiff, throughout the project, Wasserman, Quercia, and Shapiro identified new alleged deficiencies and requested additional information or changes to the document. (Id.) Plaintiff

contends that "the shifting requests and requirements" prevented him from meeting his deadlines, and provided an opportunity to generate "instructional and counseling memos . . . mak[ing] it sound like [Plaintiff] didn't or couldn't do the work in a timely manner." (Id.)

On March 6, 2013, Shapiro referred Plaintiff for disciplinary charges and a general hearing, pursuant to New York Civil Service Law Section 75, based on his poor work performance and inability to follow instructions. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 175) As discussed below, the Section 75 proceedings culminated in Plaintiff's termination in January 2014.

In the interim, Plaintiff received additional assignments relating to the Forms and Reference Library. He did not complete these assignments in a satisfactory and timely manner. (See id. ¶¶ 91-92) Plaintiff's poor work performance led to additional counseling and instructional memoranda. (See Def. R. 56.1 Appx. (Dkt. No. 49) Ex. 45 (May 15, 2013 Counseling Memo); Ex. 44 (May 20, 2013 Counseling Memo))

E.    **Allegations of Interference with FMLA Rights**

Plaintiff claims that Defendants improperly denied him leave under the Family and Medical Leave Act. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 158)

Plaintiff claims to suffer from respiratory problems, including asthma and sinus issues, as well as from anxiety and depression. (Id. ¶ 155; Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 41-42, 47-48) Plaintiff contends that his respiratory problems were exacerbated as a result of exposure to (1) air contaminants after the September 11, 2001 terrorist attacks, and (2) fumes seeping into his NYCHA office from a ground floor restaurant in 2012. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 159-160; Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 41-42, 70-71, 135-136) Plaintiff obtained workers' compensation

benefits as a result of his alleged respiratory problems. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 159-160)

In February 2012, Plaintiff applied for an intermittent leave of absence under the FMLA, in order to attend weekly therapy sessions for his anxiety and depression. (See Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 47-48; id., Ex. 53 (FMLA Approvals) (Dkt. No. 49-9) at 88) On February 21, 2012, NYCHA granted Plaintiff's request and permitted him to take intermittent FMLA leave one day per week to attend therapy sessions. (Id., Ex. 53 (FMLA Approval) (Dkt. No. 49-9) at 88) NYCHA approved Plaintiff for intermittent FMLA leave for the period between February 2, 2012 and December 2, 2013. (Id. at 89-96; id., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 49)

In March 2013, Plaintiff requested that his intermittent FMLA leave also apply to treatment for his respiratory and sinus conditions. (See id., Ex. 49 (Mar. 20, 2013 Emails) (Dkt. No. 49-9) at 73-74; Pltf. Aff., Ex. K (Dkt. No. 53-8)) NYCHA granted Plaintiff's request and permitted him to apply his intermittent FMLA leave for treatment of those medical conditions, in addition to his anxiety and depression. (See Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 135-136; id., Ex. 53 (FMLA Approval) (Dkt. No. 49-9) at 96-99) Plaintiff complains, however, that NYCHA initially did not approve his request, and only approved it "months . . . after" Plaintiff filed a complaint.[11] (See Pltf. Aff. (Dkt. No. 53) ¶ 17)

Plaintiff further claims that Quercia denied his request to take FMLA leave in the "Spring [of] 2013," and "designate[d] [him] as an AWOL employee"[12] when he attempted to use

---

[11]  Plaintiff has not offered any evidence concerning the nature or substance of the complaint, when he made the complaint, to whom he made the complaint, or the form in which he made the complaint.

[12]  Under NYCHA policy, employees deemed "AWOL" – or "Absent Without Leave" – are pay-docked, regardless of accrued leave time. (Def. R. 56.1 Appx., Ex. 57 (Dkt. No. 49-10) at 21)

the FMLA leave. (See Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 53-55; Pltf. Aff.,

Ex. A (Pltf. Dep.) (Dkt. No. 53-1) at 50-52) Although Plaintiff testified that Quercia's denial of

FMLA leave is reflected in an email (Pltf. Aff., Ex. A (Pltf. Dep.) (Dkt. No. 53-1) at 53),

Plaintiff has submitted no such email. Moreover, Plaintiff's time records show that he was never

marked "AWOL." (See Def. R. 56.1 Appx., Ex. 54 (Time Report) (Dkt. No. 49-9) at 103-129)

Finally, Quercia testified that he approved all of Plaintiff's FMLA requests (See id., Ex. 8

(Quercia Dep.) (Dkt. No. 49-5) at 75-76), and Defendants have submitted numerous written

approvals of Plaintiff's FMLA leave requests for the period between February 21, 2012 and

August 30, 2013. (Id., Ex. 53 (FMLA Approvals) (Dkt. No. 49-9))[13]

## F.   **Allegations of Disability Discrimination**

Plaintiff claims that Defendants discriminated against him on the basis of his

disability by denying him a reasonable accommodation for his asthma and sleep apnea. (Pltf.

Aff. (Dkt. No. 53) ¶ 4; Def. R. 56.1 Appx., Ex. 57 (Accommodation Request) (Dkt. No. 49-10)

at 22, 26-27) Plaintiff contends that, on occasion, his asthma and sleep apnea prevent him from

sleeping, and he must resort to sleep aids Ambien or Benadryl. (Id.) Plaintiff contends that,

when these conditions flare up, he cannot report to work. (Pltf. Aff. (Dkt. No. 53) ¶ 4)

On April 9, 2012, after his asthma and sleep apnea kept him awake, Plaintiff left a

voicemail on Quercia's office line at 5:20 a.m. stating that he would not be reporting to work that

day. (See id. ¶ 18; Def. R. 56.1 Appx., Ex. 51 (Apr. 9, 2012 Counseling Memo) (Dkt. No. 49-9)

---

[13]  Plaintiff also testified that Shapiro denied him FMLA leave on one occasion by not
responding to his email requesting FMLA leave. (See Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.)
(Dkt. No. 49-3) at 61-63) The record contains no such email, nor is there any evidence of the
contents of the alleged email or when it was sent. The Court concludes that Plaintiff's assertion
is too conclusory to be given weight at summary judgment. See Hicks v. Baines, 593 F.3d 159,
166 (2d Cir. 2010) ("'[M]ere conclusory allegations . . . cannot by themselves create a genuine
issue of material fact where none would otherwise exist.'").

at 78) In an April 9, 2012 counseling memorandum, Quercia informed Plaintiff that his practice

of calling in sick during the early morning hours was not permitted:

> It appears that despite past discussions on this matter, you still either do not understand or
> refuse to comply with the requirements set forth under NYCHA's Personnel Rules and
> Regulations regarding [unscheduled leave due to illness]. Specifically, when you are
> required under the rules to notify your supervisor of an unscheduled leave within a half
> hour of your regular reporting time, it does not mean that you leave a voicemail message
> at 5:20 a.m. when you know that I am not in the office, but rather it requires that you
> make a reasonable attempt to speak to me or another supervisor in our Department
> directly.
>
> I am particularly concerned because it appears that this has become a standard routine for
> you. Your past absences denote the same pattern each time. You always call very early
> in the morning when there is no supervisor available, particularly myself, to speak with.
>
> Further failure to comply with this time and leave rule will result in my indicating that
> you are Absent Without Leave (AWOL) and will result in a pay dock.

(Def. R. 56.1 Appx., Ex. 51 (Apr. 9, 2012 Counseling Memo) (Dkt. No. 49-9) at 78)

That same day, Wasserman circulated a memo to all PIM employees "reiterat[ing]

the rules for approving requests for leave of absences and calling in sick." (Def. R. 56.1 Appx.,

Ex. 57 (Dkt. No. 49-10) at 21) The memo states that "all requests for personal, sick, and

vacation time" must be approved by supervisors, and that

> [i]f [an employee] will be out sick or for some other unforeseen circumstances, [the
> employee] must call within 30 minutes of [his] normal reporting time [to] speak to [his]
> direct supervisor. Again, if [an employee's] supervisor is unavailable[, he] should follow
> the chain of command until [he] speak[s] to a manager. It is unacceptable to leave
> voicemail messages or messages with . . . co-workers.

(Id.) Plaintiff contends that he "was not aware that [his early morning notification] was

unacceptable until [he] received [Quercia's] counseling memo." (Pltf. Aff. (Dkt. No. 53) ¶ 18)

On July 6, 2012, Plaintiff submitted an accommodation request seeking an

exemption from the unscheduled sick leave notification policy. (Pltf. Resp. to Def. R. 56.1 Stmt.

(Dkt. No. 52) ¶ 165)  In his request, Plaintiff states that his asthma and sleep apnea conditions

make it difficult for him to adhere to the notification policy:

> My difficulties adhering to these policies, in detail[,] are:  when I am required to contact
> management within 30 minutes of my reporting time.  Instead, my request is to have the
> ability to contact management within a 12-hour period of my reporting time, once an
> illness is known.
>
> For instance, if my reporting time is 9am Monday morning, then based on my request, I
> would need to report my sickness to management between the hours of 9pm Sunday
> evening until 9am Monday morning.
>
> The 12-hour period is important since most of the time during the outset of my illness[,] I
> am consuming prescribed medications (such as Ambien or Benadryl) which will sedate
> me for over a 12-hour period.  These medications were prescribed for a temporary relief
> in treating my asthmatic or sleep apnea condition.
>
> Also, the 12-hour period of reporting is important . . . to avoid becoming AWOL from
> not being able to fulfill[] a 30-minute reporting time requirement. . . .

(Def. R. 56.1 Appx., Ex. 57 (Accommodation Request) (Dkt. No. 49-10) at 22-23)  Plaintiff also

requested that he be permitted to contact supervisors by voicemail or email, rather than speaking

in person directly.  (Id. at 23)  Plaintiff attached to his request a medical record showing his sleep

apnea diagnosis, as well as documentation from his workers' compensation claim relating to his

sinus and respiratory issues.  (Id. at 25-27)

On August 31, 2012, Shapiro denied Plaintiff's request for an accommodation,

stating:

> Based on the information provided in both the filed Workers' Compensation Claim and
> the medical document[,] I see no basis for granting [the] accommodation.  Nothing in the
> documents provided suggests that [Plaintiff] is unable to call within the normal reporting
> time.

(Id. at 20)  At her deposition, Shapiro testified that she denied Plaintiff's request because (1)

granting it would "adversely affect the running of [her] department"; and (2) Plaintiff's

supporting medical documentation did not address the medications he claimed he needed to take to treat his conditions. (Id., Ex. 6 (Shapiro Dep.) (Dkt. No. 49-5) at 97-98)

### G. Section 75 Proceedings and Plaintiff's Termination

On March 6, 2013, Shapiro referred Plaintiff for disciplinary charges and a general hearing, pursuant to New York Civil Service Law Section 75. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 175) Shapiro cited Plaintiff's "[c]onsistent unsatisfactory work performance and inability to follow instructions" as the reason for pursuing a general hearing, and listed the counseling and instructional memoranda discussed above as the bases for the disciplinary charges. (Def. R. 56.1 Appx., Ex. 58 (Request for General Trial) (Dkt. No. 49-10) at 31) On April 5, 2013, Plaintiff was served with three charges of incompetency and misconduct based on the incidents described in the April 27, 2012, June 4, 2012, and March 1, 2013 counseling memoranda discussed above. (See id., Ex. 59 (Apr. 5, 2013 Charge Letter) (Dkt. No. 49-10) at 33-36) On May 22, 2013, Plaintiff was served with five amended charges based on his continued poor job performance and the additional counseling memoranda issued after Shapiro's March 2013 referral. (See id., Ex. 60 (May 22, 2013 Charge Letter) (Dkt. No. 49-10) at 38-42) Four of the five charges related to Plaintiff's unsatisfactory work performance at four different stages of the Forms and Reference Library project, while the fifth charge related to Plaintiff's failure to monitor the NeoPost print queue in June 2012. (See id.)

The Section 75 general trial was conducted over a six-day period between July 17, 2013 and November 6, 2013. Plaintiff was represented by counsel throughout the proceedings. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 181-182) Shapiro, Wasserman, and Quercia testified on behalf of NYCHA, while Plaintiff testified on his own behalf. (Id. ¶ 183)

On December 3, 2013, the trial officer presiding over the Section 75 general trial

issued a report and recommendation sustaining all charges against Plaintiff and recommending

his termination:

> [NYCHA] has charged [Dudley] with both incompetency and misconduct. Discipline based on a theory of incompetence or incapacity does not require a showing of fault on the part of the employee but only a demonstration that the employee is unable to perform the duties of the position at a minimum level of competence. Here, [Dudley] failed to complete three of four tasks assigned to him relating to the Forms and Reference Library, in spite of extraordinary effort by his supervisors to assist him, numerous extensions of deadlines, and opportunities to obtain further professional training. [Dudley] also failed to monitor the correct screen [of the NeoPost print queue] on June 12, 2012, resulting in a massive backlog of print requests.
>
> Some of the charges appear to be insubordination and failure to follow direct orders, such as [Dudley's] persistent failure to submit his work in an electronic format that his supervisors could edit. Giving [Dudley] the benefit of the doubt on those matters, the record clearly documents [his] incapacity, inability and incompetence to complete the tasks assigned to him. These tasks were well within the description of his job title. . . . As Wasserman and Shapiro testified, the modification of the Forms and Reference Library was a relatively small-scale project, well within the job description of a Computer Specialist (Software) Level 1.
>
> I sustain all of the charges under a theory of incompetency and incapacity.
>
> Having sustained charges against [Dudley], I reviewed his personnel file. Between July 12, 2010 and January 17, 2012[,] . . . [he] received 26 instructional and counseling memos in his previous assignment . . . [with the BST]. These memos covered a range of incompetency and misconduct: failure to complete assigned duties, insubordination and failure to follow directives, time and attendance issues, excessive absence and AWOL, out of area, unprofessional conduct and misrepresentation, and backdating and inaccurate documentation.
>
> . . .
>
> In short, [Dudley] brought to the [PIM] the same mixture of incompetency and insubordination so well documented in the 26 counseling and instructional memos he was issued in his previous assignment. I recommend that [Dudley] be dismissed.

(Def. R. 56.1 Appx., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-10) at 53-55)

On January 3, 2014, NYCHA adopted the trial officer's recommendation and

terminated Plaintiff's employment. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 196; see

also Def. R. 56.1 Appx. (Dkt. No. 49) Exs. 62, 63)  Plaintiff appealed the trial officer's determination to the New York City Civil Service Commission, which affirmed the determination on June 13, 2014.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 197; Def. R. 56.1 Appx., Ex. 64 (Civil Service Commission Decision) (Dkt. No. 49-10) at 61)

## II.    PROCEDURAL HISTORY

On January 10, 2014, Plaintiff filed a Charge of Discrimination with the EEOC, asserting claims of racial and disability discrimination, and retaliation.  (Def. R. 56.1 Appx., Ex. 65 (EEOC Charge) (Dkt. No. 49-10) at 68)  The EEOC issued a Right to Sue Letter on April 9, 2014.  (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 201)

The Complaint in this action was filed on July 9, 2014, and asserts claims for (1) race and disability discrimination and hostile work environment, in violation of Title VII, the ADA, the NYSHRL, and the NYCHRL; (2) retaliation, in violation of Title VII, the ADA, the NYSHRL, and the NYCHRL; and (3) FMLA interference.  (See Cmplt. (Dkt. No. 2))

Defendants have moved for summary judgment on all claims.  (Notice of Motion (Dkt. No. 47))  Plaintiff has withdrawn his race discrimination claim (Pltf. Opp. Br. (Dkt. No. 51) at 5 n.1), but otherwise opposes Defendants' motion.  (Id. at 5-6, 16-28)

## DISCUSSION

## I.    LEGAL STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  "When no rational jury could find

in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"In cases based on allegations of [discrimination and] discriminatory retaliation, courts must use 'an extra measure of caution' in determining whether to grant summary judgment[,] 'because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence.'" Thompson v. Morris Heights Health Ctr., No. 09 Civ. 7239 (PAE) (THK), 2012 WL 1145964, at *4 (S.D.N.Y. Apr. 6, 2012) (quoting Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006)).

However, "'the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination [and retaliation] cases than to . . . other areas of litigation.'" Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985)). As in any other case, a

25

plaintiff in a discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' [H]e must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown, 257 F.3d at 252 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)) (internal citations omitted). "Mere conclusory statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002); see also Risco v. McHugh, 868 F. Supp. 2d 75, 98 (S.D.N.Y. 2012) ("'[E]ven in the discrimination context, . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment' . . . [and] 'must offer some hard evidence showing that [his] version of the events is not wholly fanciful.'" (quoting Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008); Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005))).

## II.     THE FEDERAL LAW CLAIMS

The Complaint asserts claims for race and disability discrimination, hostile work environment, and retaliation under Title VII and the ADA, and for interference with Plaintiff's rights under the FMLA. (See Cmplt. (Dkt. No. 2))

Defendants argue that they are entitled to summary judgment on Plaintiff's (1) disability discrimination claim, because that claim is time-barred under the ADA; (2) hostile work environment claims, because Plaintiff has not shown that any of the alleged conduct occurred because of a protected characteristic; (3) retaliation claims, because (a) Defendants have proffered a legitimate, non-retaliatory reason for the adverse employment actions taken against Plaintiff, and (b) Plaintiff cannot demonstrate that retaliation was a but-for cause of those actions; and (4) FMLA interference claim, because Plaintiff has not shown that he was denied leave under the FMLA. (See Def. Moving Br. (Dkt. No. 48) at 17-40)

## A.     Preclusive Effect of Prior Proceedings

As an initial matter, Defendants argue that <u>res judicata</u> and collateral estoppel "preclude most of Plaintiff's discrimination and retaliation claims." (<u>Id.</u> at 8-9, 14-17) Defendants contend that (1) this Court's prior decision dismissing <u>Dudley I</u> – Plaintiff's 2012 lawsuit – is <u>res judicata</u> as to certain events here; and (2) the Section 75 general trial resulted in findings of fact concerning Plaintiff's job performance and termination that are entitled to preclusive effect here. (<u>Id.</u> at 9, 14-17)

### 1.     This Court's Decision in *Dudley I*

Defendants argue that the claims raised in <u>Dudley I</u> "included . . . retaliation arising out of Plaintiff's transfer to the [PIM] and [the] four counseling memoranda issued to [Plaintiff] between April 9, 2012 and June 4, 2012," and that this Court's dismissal of those claims on summary judgment is <u>res judicata</u> for purposes of the instant case. (<u>Id.</u> at 14) According to Defendants, Plaintiff's transfer and the four counseling memoranda "cannot be used as the bases for Plaintiff's claims in this action." (<u>Id.</u>)

"The doctrine of <u>res judicata</u>, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" <u>Monahan v. New York City Dep't of Corr.</u>, 214 F.3d 275, 284 (2d Cir. 2000) (quoting <u>Allen v. McCurry</u>, 449 U.S. 90, 94 (1980)). "'Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.'" <u>Id.</u> (quoting <u>NLRB v. United Technologies Corp.</u>, 706 F.2d 1254, 1260 (2d Cir. 1983)). "The question of whether two actions arise from the same transaction or claim is addressed by determining[, <u>inter alia</u>,] if the

'underlying facts are related in time, space, origin, or motivation. . . .'" Medcalf v. Thompson Hine LLP, 84 F. Supp. 3d 313, 325 (S.D.N.Y. 2015).

The claims in Dudley I arose from Plaintiff's tenure at the BST, and were based primarily on alleged discriminatory and retaliatory actions by Plaintiff's BST supervisors – Yehuda Gelbfish and Krzysztof Orlowski – during the period from 2009 to 2011. (See Def. R. 56.1 Appx. (Dkt. No. 49) Exs. 13, 14) Gelbfish and Orlowski are not parties to this litigation. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 13) Plaintiff's claims in the instant case are based on alleged discriminatory and retaliatory actions taken by Plaintiff's supervisors at the PIM between 2012 and Plaintiff's termination in January 2014, based on his having filed the Dudley I lawsuit on April 10, 2012. Accordingly, the claims at issue here do not arise from the "same transaction or same series of transactions" as the claims alleged in Dudley I, and this Court's decision in Dudley I does not preclude Plaintiff from proceeding on the claims alleged in the instant case.[14]

## 2.   The Section 75 General Trial Proceedings

With respect to the Section 75 general trial proceedings, Defendants argue that the trial officer's findings of fact "collaterally estop" Plaintiff from disputing his incompetency and from "relitigat[ing] the decision to terminate his employment." (Def. Moving Br. (Dkt. No. 48)

---

[14] In Dudley I, this Court briefly addressed Plaintiff's transfer to the PIM and the April and June 2012 counseling memoranda in connection with Plaintiff's retaliation claim, which was premised on the theory that certain complaints he had made in November and December 2011 while at the BST constituted protected activity. See Dudley, 2014 WL 5003799, at *31-32. The Court stated: "To the extent Dudley claims he was retaliated against when he received four counseling memoranda between April 9, 2012 and June 4, 2012, these memoranda are too far removed in time from the November and December [2011] emails [to his BST supervisors] to provide an inference of retaliatory intent." Id. at *32. Plaintiff's current retaliation claim is not premised on the November and December 2011 emails referenced in Dudley I, however. Instead, the protected activity at issue occurred in 2012, and includes, in particular, Plaintiff's filing of the lawsuit in Dudley I on April 10, 2012. (See Cmplt. (Dkt. No. 2) ¶¶ 21-22)

at 14-17) Defendants contend that the trial officer's "factual findings sustaining the charges of [incompetency and misconduct] must be given preclusive effect in this case," and that Plaintiff cannot now "attempt to create disputed factual issues by challenging those facts." (Def. Reply Br. (Dkt. No. 50) at 8-9)

"State law governs the preclusive effects in federal court of a state administrative agency's quasi-judicial findings," including findings made by administrative officers after conducting a general trial pursuant to New York Civil Service Law Section 75. See Matusick v. Erie Cnty. Water Auth., 757 F.3d 31, 45 (2d Cir. 2014). Under New York law, "in order to have preclusive effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication." Id. (citing Restatement (Second) of Judgments § 27 (1982)). Moreover, "issue preclusion does not apply unless there was 'a full and fair opportunity [for the party against whom preclusion is sought] to contest the decision now said to be controlling.'" Id. (quoting Buechel v. Bain, 97 N.Y.2d 295, 304 (2001)).

In the employment context, however, "[e]ven if the [Section 75] factfinder decides that the defendants terminated the plaintiff in part for legitimate reasons," a plaintiff "may [still] prevail on his . . . claim [under a federal, state, or city anti-discrimination statute] if he . . . can demonstrate that his . . . employer was motivated, at least in part, by discriminatory [or retaliatory] purposes." Id. (citation omitted). In this regard, a hearing officer's findings of fact do not necessarily preclude a plaintiff from pursuing a discrimination or retaliation claim, although a federal district court may nonetheless be bound by the hearing officer's factual findings, to the extent those findings are relevant.

<u>Matusick v. Erie County Water Authority</u>, 757 F.3d 31 (2d Cir. 2014) is

instructive on this point. In that case, plaintiff was terminated following a Section 75 general

trial, but later brought an action for employment discrimination in federal court. <u>Matusick</u>, 757

F.3d at 36-41. In addressing "[w]hether the hearing officer's fact-findings that there was a

sufficient and legitimate basis for [plaintiff's] termination precluded . . . plaintiff from

relitigating those issues in the district court," <u>see id.</u> at 45, the court stated:

> The hearing officer's ultimate conclusions – that [plaintiff] had committed disciplinable misconduct and was incompetent – were guided by the particular legal framework and standards applicable in section 75 proceedings. The section 75 framework differs substantially from the legal framework for state and federal employment discrimination law applicable to [plaintiff's] federal jury trial. The hearing officer's conclusions about the significance of [plaintiff's] misconduct and incompetence for purposes of section 75, therefore, are not preclusive of any findings that the jury could have made in the course of their deliberations with respect to the reasons for [plaintiff's] termination. In particular, the hearing officer's conclusions did not preclude the jury from finding that [plaintiff] was terminated in substantial part because of [discriminatory or retaliatory intent].
>
> [However,] [t]he <u>factual</u> findings supporting the hearing officer's ultimate conclusion – that [plaintiff] had indeed committed the charged conduct, <u>i.e.</u>, that he had failed to respond to calls and slept on duty – are of a different nature. These findings precluded [plaintiff] from arguing otherwise at trial. Therefore, in the course of deciding . . . whether the defendants terminated [plaintiff] for legitimate or illegal reasons, the jury was required to accept that [plaintiff] had failed to perform – satisfactorily, if at all – some of his duties at the ECWA.
>
> Applying these principles to this case, we conclude that the jury was precluded from finding that [plaintiff] had not actually engaged in the conduct charged against him in the section 75 hearing.

<u>Id.</u> at 49 (internal citations omitted) (emphasis in original).

      Here, the trial officer presiding over Plaintiff's Section 75 general trial sustained

all charges of incompetency and misconduct against Plaintiff. In doing so, the trial officer made

findings of fact. (<u>See</u> Def. R. 56.1 Appx., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-

10)) For example, the trial officer found that "the record clearly documents [Plaintiff's]

incapacity, inability and incompetence to complete the tasks assigned to him" with respect to

NeoPost and the Forms and Reference Library. (Id. at 55) Accordingly, in resolving the instant motion for summary judgment, this Court will give preclusive effect to the trial officer's findings of fact concerning Plaintiff's deficient job performance. See Matusick, 757 F.3d at 49. Plaintiff is not precluded thereby from arguing that Defendants acted with retaliatory intent, however, and Plaintiff's claims under the anti-discrimination statutes are not barred by res judicata.

**B.    Discrimination Claims**

The Complaint asserts claims for (1) race discrimination, in violation of Title VII; (2) disability discrimination premised on a failure to accommodate, in violation of the ADA; and (3) hostile work environment, in violation of Title VII and the ADA. (See Cmplt. (Dkt. No. 2))

As noted above, Plaintiff has withdrawn his race discrimination claim under Title VII (see Pltf. Opp. Br. (Dkt. No. 51) at 5 n.1), and accordingly, that claim is dismissed. Plaintiff's remaining federal law discrimination claims are considered below.

**1.    Disability Discrimination under the ADA**

Defendants argue that Plaintiff's disability discrimination claim under the ADA for failure to accommodate should be dismissed as time-barred, because Plaintiff did not timely file a charge with the EEOC. (Def. Moving Br. (Dkt. No. 48) at 36)

**a.    Applicable Law**

A discrimination claim under the ADA may be premised on an employer's "failure to provide an employee with a reasonable accommodation for his disability." Nieblas-Love v. New York City Hous. Auth., 165 F. Supp. 3d 51, 73 (S.D.N.Y. 2016). "In order to assert [an ADA] claim in federal court, [however,] a plaintiff must first 'file a charge of discrimination . . . with the EEOC within 180 days of the alleged unlawful employment action or, if the claimant has already filed the charge with a state or local equal employment agency,

within 300 days of the alleged discriminatory action.'" <u>Butterfield-Bajinan v. City of New York</u>, No. 16 Civ. 5919 (RJS), 2017 WL 4045175, at *3 (S.D.N.Y. Sept. 11, 2017) (quoting <u>Van Zant v. KIM Royal Dutch Airlines</u>, 80 F.3d 708, 712 (2d Cir. 1996)); 42 U.S.C. § 12117(a) (ADA claims are governed by procedures applicable to Title VII claims); <u>see</u> <u>also</u> <u>Predun v. Shoreham-Wading River Sch. Dist.</u>, 489 F. Supp. 2d 223, 227 (E.D.N.Y. 2007) ("Prior to commencement of ADA litigation, a plaintiff must file administrative charges with the EEOC."). "This statutory filing period is 'analogous to a statute of limitations,' with the result that 'discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiff's suit in district court.'" <u>Butterfield-Bajinan</u>, 2017 WL 4045175, at *3 (quoting <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 765 (2d Cir. 1998)).

### b.  **Analysis**

Here, Plaintiff contends that Defendants discriminated against him on the basis of his disability when they denied him a reasonable accommodation for his respiratory and sleep apnea conditions. (Pltf. Aff. (Dkt. No. 53) ¶ 4; Pltf. Opp. Br. (Dkt. No. 51) at 25) The record shows that on July 6, 2012, Plaintiff submitted an accommodation request for exemption from NYCHA's unscheduled sick leave notice requirement. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶ 165) Shapiro denied Plaintiff's request on August 31, 2012. (<u>Id.</u> ¶ 169) Plaintiff did not file a charge of disability discrimination with the EEOC until January 10, 2014 -- 497 days after Shapiro denied his request for an accommodation. (<u>See id.</u> ¶ 174) Because Plaintiff's EEOC charge was filed well outside the applicable statutory filing period, his ADA claim is time-barred.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's disability discrimination claim under the ADA.

## 2.    Hostile Work Environment

Defendants argue that they are entitled to summary judgment on Plaintiff's hostile work environment claims under Title VII and the ADA, because there is "no evidence that [Defendants' conduct] towards Plaintiff was motivated by a protected characteristic or [that Defendants' conduct] created a work environment permeated with discriminatory abuse." (Def. Moving Br. (Dkt. No. 48) at 21-22; see also Def. Reply Br. (Dkt. No. 51) at 5 n.1)

### a.    Applicable Law

In order to establish a hostile work environment claim under Title VII and the ADA, "'a plaintiff must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."'" Grewal v. Cuneo Gilbert & LaDuca LLP, No. 13 Civ. 6836 (RA), 2017 WL 1215752, at *11 (S.D.N.Y. Mar. 31, 2017) (quoting Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993))); see also Kleinman v. Fashion Inst. of Tech., No. 16 Civ. 4348 (KPF), 2017 WL 3016940, at *10 (S.D.N.Y. July 14, 2017) (ADA).[15] "'[I]t is axiomatic that the plaintiff must show that the hostile conduct occurred because of a protected characteristic[, however.]'" Grewal, 2017 WL 1215752, at *11 (quoting Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)).

---

[15]  Although "'[t]he Second Circuit has not yet decided whether a hostile work environment claim is cognizable under the ADA,'" Kleinman, 2017 WL 3016940, at *10 (quoting Flieger v. E. Suffolk BOCES, No. 16-2556-cv, 2017 WL 2377853, at *3 (2d Cir. June 1, 2017) (summary order)) (internal quotation marks omitted), district courts in this Circuit "evaluate[] ADA hostile work environment claims using 'the Title VII standard.'" Id.

**b.** __Analysis__

Here, Plaintiff contends that he "was subjected to a hostile work environment in retaliation for his prior protected activities." (Pltf. Opp. Br. (Dkt. No. 51) at 28) (emphasis added) Plaintiff's "retaliatory hostile work environment claim" rests on allegations that

> from the time Plaintiff transferred to [the PIM], he was subjected to a steady stream of harassment, which included overscrutinization of his work, being yelled at by Shapiro and Wasserman and glared at by Wasserman, not being spoken to by those individuals upon his arrival at [the PIM], . . . [receiving] improper[] train[ing], consistently having his projects modified or changed, and . . . being issued memos [that] inaccurately represent[ed] the circumstances.

(Id.) Plaintiff argues that the "cumulative effect of these [retaliatory] actions clearly created an abusive environment." (Id.) Plaintiff does not contend that Defendants engaged in this alleged conduct because of his race or disability, however.

Plaintiff's "retaliatory hostile work environment" claim fails as a matter of law. As explained above, a hostile work environment claim under Title VII and the ADA requires proof that "'the hostile conduct occurred because of a protected characteristic.'" Grewal, 2017 WL 1215752, at *11 (quoting Tolbert, 790 F.3d at 439) (emphasis added). Plaintiff does not argue, however, that Defendants' alleged abusive conduct occurred because of a protected characteristic – that is, because of his race or disability. Instead, Plaintiff contends only that the abuse occurred "in retaliation for his prior protected activities." (Pltf. Opp. Br. (Dkt. No. 51) at 28) While Plaintiff's allegations will be considered in the context of his retaliation claims, they do not provide a basis for a hostile work environment claim.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's hostile work environment claims under Title VII and the ADA.

**C.** **Retaliation Claims**

**1.** **Applicable Law**

Retaliation claims brought under Title VII and the ADA are "analyzed under the three-step burden-shifting scheme articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Nieblas-Love, 165 F. Supp. 3d at 65-66, 74-75. "First, the plaintiff must establish a prima facie case of retaliation by showing: '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" Hicks, 593 F.3d at 164 (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). "A causal connection in retaliation claims can be shown either '(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" Littlejohn, 795 F.3d at 319 (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff's burden in establishing a prima facie case is "'de minimis,' and 'the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'" Hicks, 593 F.3d at 164 (quoting Jute, 420 F.3d at 173). "If the plaintiff sustains this initial burden, 'a presumption of retaliation arises.'" Id. (quoting Jute, 420 F.3d at 173).

At the second step of the McDonnell Douglas analysis, the burden shifts to the defendant to rebut the presumption of retaliation "by 'articulat[ing] a legitimate, non-retaliatory reason for the adverse employment action.'" Ya-Chen Chen v. City Univ. of New York, 805

F.3d 59, 70 (2d Cir. 2015). "If the defendant provides such an explanation, 'the presumption of retaliation dissipates.'" Id. (quoting Jute, 420 F.3d at 173).

At the third and final step of the analysis, "[t]he plaintiff must . . . come forward with [proof that the] non-retaliatory reason is a mere pretext for retaliation." Misas v. N. Shore-Long Island Jewish Health Sys., No. 14 Civ. 08787 (ALC) (DCF), 2017 WL 1535112, at *9 (S.D.N.Y. Apr. 27, 2017) (citation and internal quotation marks omitted). To satisfy this burden, "the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action,'" Ya-Chen Chen, 805 F.3d at 70 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013)), and "not simply a 'substantial' or 'motivating' factor in the employer's decision." See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013) (citing Nassar, 133 S. Ct. at 2526, 2533). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." Id. (citations omitted). "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Id.

## 2.  Analysis

In moving for summary judgment on Plaintiff's federal law retaliation claims, Defendants argue, inter alia, that (1) they have offered a legitimate, non-retaliatory reason for the adverse employment actions taken against Plaintiff; and (2) Plaintiff has not shown that Defendants' "desire to retaliate was the but-for cause of any challenged adverse employment action." (See Def. Moving Br. (Dkt. No. 48) at 10, 28-35)

Plaintiff's retaliation claims are premised on the theory that, following his transfer to the PIM, Defendants retaliated against him as a result of his prior complaints against his BST supervisors and, in particular, for his filing of the Dudley I lawsuit on April 10, 2012. (See Pltf. Opp. Br. (Dkt. No. 51) at 5-6, 21-22) Plaintiff contends that, as a result of his complaints and lawsuit, his new supervisors in the PIM – Shapiro, Wasserman, and Quercia – disciplined him through "false and pretextual counseling and instructional memo[randa]," and ultimately terminated his employment. (See id. at 22) According to Plaintiff, "retaliatory animus can be established through: (1) the statements of Defendants[, as described in Tamarkin's testimony concerning his January 2012 meeting with Wasserman and Quercia, and Plaintiff's testimony concerning his conversation with Glenn Davis]; [and] (2) the temporal proximity between Plaintiff's complaints, his transfer to the [PIM], and the [disciplinary actions] to which he was subjected." (Id. at 21-22)

Acknowledging that Plaintiff has satisfied his "de minimis" burden in making out a prima facie case of retaliation, see Hicks, 593 F.3d at 164, the Court will turn to the second and third steps of the McDonnell Douglas analysis.

As to the second step, Defendants have plainly articulated a legitimate, non-retaliatory reason for the disciplinary actions taken against Plaintiff – namely, the repeated and well-documented deficiencies in his work performance throughout his tenure at the PIM. (See Def. Moving Br. (Dkt. No. 48) at 33-35; Def. Reply Br. (Dkt. No. 50) at 12-13) Plaintiff's supervisors documented these deficiencies in detail through a series of counseling memoranda (see Def. R. 56.1 Appx. (Dkt. No. 49) Ex. 41 (Apr. 27, 2012 Counseling Memo); Ex. 40 (June 4, 2012 Counseling Memo); Ex. 35 (Mar. 1, 2013 Counseling Memo); Ex. 45 (May 15, 2013 Counseling Memo); Ex. 44 (May 20, 2013 Counseling Memo)), which provided the basis for the

five charges of incompetency and misconduct heard by the impartial trial officer at Plaintiff's Section 75 general trial. (See id., Ex. 60 (May 22, 2013 Charge Letter))

Following a six-day hearing, during which the trial officer reviewed the counseling memoranda and heard testimony from Plaintiff, Shapiro, Wasserman, and Quercia, the trial officer sustained all five charges of incompetency against Plaintiff. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 52) ¶¶ 181-183; Def. R. 56.1 Appx., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-10)) The trial officer concluded that "the record clearly documents [Plaintiff's] incapacity, inability and incompetence to complete the tasks assigned to him," and made findings of fact in support of that conclusion. (Def. R. 56.1 Appx., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-10) at 48-54) In particular, the trial officer found that all of Plaintiff's assigned tasks relating to the Forms and Reference Library and NeoPost application "were well within the description of his job title"; that Plaintiff's supervisors "devoted extraordinary amounts of extra time in one-on-one sessions trying to explain the tasks to [Plaintiff]"; that Plaintiff repeatedly claimed at each stage of his assignments that "he needed more time and additional training before he could work on the task at hand"; that his supervisors gave him "opportunities to obtain further professional training"; and that, with respect to his Forms and Reference Library assignments, Plaintiff consistently "submitted poor work" and "submitted one draft after another that did not incorporate the criticisms of his previous drafts," which "caused delays." (Id. at 48-49, 53-54) These findings of fact are entitled to preclusive effect for purposes of the instant motion, see Matusick, 757 F.3d at 49, and cannot be disputed or otherwise relitigated by Plaintiff. They plainly offer a legitimate, non-retaliatory reason for the disciplinary actions taken against Plaintiff.

As to the third step of the McDonnell Douglas analysis, Plaintiff argues that Defendants' actions were pretextual, and that his supervisors "set him up to fail," "placed him in positions where he could not functionally perform his job," and gave him "no possibility . . . to succeed" in his new role at the PIM. (See Pltf. Opp. Br. (Dkt. No. 51) at 5-6, 21-22) According to Plaintiff, "[b]ased on the testimony of Tamarkin" concerning Wasserman and Quercia's desire to collect unspecified "information" about Plaintiff (see Def. R. 56.1 Appx., Ex. 12 (Tamarkin Dep.) (Dkt. No. 49-6) at 24), a reasonable jury could conclude that – "but for Plaintiff's being deemed a troublemaker" based on his prior complaints – he would not have been "forced to perform tasks outside of his job description," "denied proper training," "subjected to false and pretextual counseling and instructional memos," or "sent to a [g]eneral [h]earing." (Pltf. Opp. Br. (Dkt. No. 51) at 22)

These arguments are foreclosed by the Section 75 trial officer's findings of fact and belied by the record, however. To the extent that Plaintiff argues that he was assigned tasks outside of his job description, denied proper training, or subjected to "false" counseling memoranda – as discussed above – the trial officer expressly concluded otherwise. (See Def. R. 56.1 Appx., Ex. 61 (Trial Officer Recommendation) (Dkt. No. 49-10) at 48-54) Plaintiff cannot relitigate those factual findings, see Matusick, 757 F.3d at 49, and his contention that he was "set up to fail" is therefore without basis. Moreover, the record plainly demonstrates that – in light of Plaintiff's consistently unsatisfactory work performance over a period of years, stretching back to his time at the BST, see Dudley I, 2014 WL 5003799, *24 (rejecting Plaintiff's race discrimination, hostile work environment, and retaliation claims where defendants had "demonstrated that the disciplinary actions against Dudley were taken in response to a well-documented history of absences, tardiness, and deficiencies in his work performance") – the

counseling memoranda and Plaintiff's eventual termination were well-supported and premised on legitimate, non-retaliatory grounds. Under the circumstances, the Court concludes that no reasonable jury could find that Defendants' alleged retaliatory motive was a but-for cause of the disciplinary actions taken against Plaintiff.

Accordingly, Defendants are entitled to summary judgment on Plaintiff's retaliation claims under Title VII and the ADA.

### D. FMLA Claim

#### 1. Applicable Law

The Family and Medical Leave Act gives eligible employees an "entitlement" to twelve workweeks per year of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of [his] position." See 29 U.S.C. § 2612(a)(1)(D).

"To protect that entitlement, the Act 'makes it illegal for employers to: (1) "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided under the FMLA; or (2) "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA,'" Stuart v. T-Mobile USA, Inc., No. 14 Civ. 4252 (JMF), 2015 WL 4760184, at *3 (S.D.N.Y. Aug. 12, 2015) (quoting Smith v. Westchester Cnty., 769 F. Supp. 2d 448, 462 (S.D.N.Y. 2011) (quoting 29 U.S.C. § 2615(a))), and "'creates a private right of action to seek both equitable relief and money damages against any employer' that 'interfere[s] with, restrain[s], or den[ies] the exercise of FMLA rights.'" Id. (quoting Nevada Dept. of Human Resources v. Hibbs, 538 U.S. 721, 724-25 (2003)). In this regard, "[t]he Second Circuit has recognized two types of FMLA claims – 'interference' claims and 'retaliation' claims." Smith, 769 F. Supp. 2d at 463 (S.D.N.Y. 2011) (citing Potenza v. City

of New York, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam)).  Here, Plaintiff asserts an FMLA interference claim.  (Cmplt. (Dkt. No. 2) ¶¶ 25-26, 33; Pltf. Opp. Br. (Dkt. No. 51) at 26)

   In order to prevail on a claim for FMLA interference, a plaintiff must establish "'(1) that [he] is an eligible employee under the FMLA; (2) that defendant is an employer as defined in [the] FMLA; (3) that [he] was entitled to leave under [the] FMLA; (4) that [he] gave notice to the defendant of [his] intention to take leave; and (5) that [he] was denied benefits to which [he] was entitled under [the] FMLA.'"  Rengan v. FX Direct Dealer, LLC, No. 15 Civ. 4137 (JGK), 2017 WL 3382074, at *5 (S.D.N.Y. Aug. 4, 2017) (quoting Geromanos v. Columbia Univ., 322 F. Supp. 2d 420, 427 (S.D.N.Y. 2004)).  "[W]hatever the nature of the alleged interference, a plaintiff can establish a violation of the Act only if the employer's actions 'ultimately result in the denial of a benefit under the FMLA.'"  Stuart, 2015 WL 4760184, at *3 (quoting DeAngelo v. YellowbookInc., No. 12 Civ. 520 (GWC), 2015 WL 1915641, at *14 (D. Conn. Apr. 27, 2015)).

## 2. Analysis

   Plaintiff contends that Defendants interfered with his FMLA rights by improperly denying his request to use intermittent FMLA leave for treatment of his respiratory and sinus conditions.  (See Pltf. Opp. Br. (Dkt. No. 51) at 26; Pltf. Aff. (Dkt. No. 53) ¶ 17)  In February 2012, Plaintiff applied for and was granted intermittent FMLA leave for the period between February 2, 2012 and December 2, 2013.  (See Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 47-49; id., Ex. 53 (FMLA Approval) (Dkt. No. 49-9) at 88-96)  The intermittent FMLA leave initially only covered Plaintiff's weekly therapy sessions for his anxiety and depression, but was later expanded to cover treatment for Plaintiff's respiratory and sinus conditions.  (See id., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 47-49, 135-136)  Plaintiff contends, however, that

NYCHA initially denied his request to apply his intermittent FMLA leave to his respiratory and sinus conditions, and only approved Plaintiff's request "months . . . after" Plaintiff filed a complaint. (See Pltf. Aff. (Dkt. No. 53) ¶ 17)

In moving for summary judgment, Defendants argue that Plaintiff has not proffered sufficient evidence to demonstrate that he was denied leave under the FMLA. (See Def. Moving Br. (Dkt. No. 48) at 37; Def. Reply Br. (Dkt. No. 50) at 18-19)

There is, of course, no dispute that NYCHA ultimately approved Plaintiff's request for intermittent FMLA leave to treat his respiratory and sinus conditions. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 49) ¶ 155) To the extent that Plaintiff asserts that NYCHA did not approve his request until "months . . . after" Plaintiff filed a complaint, there is – as noted above – no evidence that any complaint was filed. Plaintiff has not offered any evidence concerning the nature or substance of the complaint, when he made the complaint, to whom he made the complaint, or the form in which he made the complaint.

While Plaintiff claims that Quercia denied his request to take FMLA leave in an email sent during the "Spring [of] 2013," and "designate[d] [him] as an AWOL employee" when Plaintiff attempted to use the leave (see Def. R. 56.1 Appx., Ex. 4 (Pltf. Dep.) (Dkt. No. 49-3) at 53-55; Pltf. Aff., Ex. A (Pltf. Dep.) (Dkt. No. 53-1) at 50-53), as discussed earlier, there is no evidence that any such email was sent. Moreover, Plaintiff's time records show that he was never marked "AWOL." (See Def. R. 56.1 Appx., Ex. 54 (Time Report) (Dkt. No. 49-9) at 103-129) Quercia also testified that he approved all of Plaintiff's FMLA requests (see id., Ex. 8 (Quercia Dep.) (Dkt. No. 49-5) at 75-76), and his testimony is corroborated by numerous designations of approved intermittent FMLA leave that appear on Plaintiff's timesheets during his tenure at the PIM. (Def. R. 56.1 Appx., Ex. 54 (Time Report) (Dkt. No. 49-9) at 103-129)

Given this record, Plaintiff's vague and unsupported claim that he was at some point temporarily denied FMLA leave is too speculative and conclusory to create a material issue of fact. See Hicks, 593 F.3d at 166.

Even if Plaintiff had offered sufficient evidence that he had temporarily been denied FMLA leave for his respiratory and sinus conditions, a mere delay in obtaining approval does not constitute an FMLA violation unless Plaintiff shows that he was (1) "harmed as a result of the [delay]," and (2) "did not take FMLA days because he . . . [lacked the] approval." See Smith, 769 F. Supp. 2d at 467. There is no such evidence here.

Defendants' motion for summary judgment on Plaintiff's FMLA claim will be granted.

## III. STATE AND CITY LAW CLAIMS

Because this Court has granted Defendants summary judgment on all of Plaintiff's federal law claims, the Court must consider whether to exercise supplemental jurisdiction over Plaintiff's remaining claims brought under the NYSHRL and the NYCHRL.

Federal district courts have supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, "such jurisdiction is discretionary," Vuona v. Merrill Lynch & Co., 919 F. Supp. 2d 359, 393 (S.D.N.Y. 2013) (citing City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)), and "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" Id. (quoting 28 U.S.C. § 1367(c)(3)).

"'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims." Sefovic v. Mem'l Sloan Kettering Cancer Ctr., No. 15 Civ. 5792 (PAC), 2017 WL 3668845, at *8 (S.D.N.Y. Aug. 23, 2017) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); see also Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."). In the context of employment discrimination actions, federal courts may decline to exercise supplemental jurisdiction over state and city law claims where, as here, a defendant has been granted summary judgment on all federal law claims. See, e.g., Sefovic, 2017 WL 3668845, at *8 (declining to exercise supplemental jurisdiction over NYSHRL and NYCHRL claims following dismissal of Title VII, ADA, and FMLA claims at summary judgment).

"Despite the general presumption, the Court concludes that, in the interest of judicial economy, it should exercise supplemental jurisdiction over [Plaintiff's] NYSHRL retaliation [and hostile work environment] claim[s], as it is well established that '[t]he standards for evaluating . . . [such] claims are identical under Title VII and the NYSHRL.'" See Nunez v. New York State Dept. of Corr., No. 14 Civ. 6647 (JMF), 2017 WL 3475494, at *4 (S.D.N.Y. Aug. 11, 2017) (quoting Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 271 n.3 (2d Cir. 2016)). Indeed, by virtue of resolving Plaintiff's Title VII and ADA retaliation and hostile work environment claims, the Court has necessarily resolved those claims under the NYSHRL. "[T]he 'values of judicial economy, convenience, fairness, and comity' [therefore] favor resolving [those claims] now." Vuona, 919 F. Supp. 2d at 393. The Court therefore grants

Defendants summary judgment on Plaintiff's NYSHRL retaliation and hostile work environment claims.

However, as to Plaintiff's disability discrimination claim under the NYSHRL, and his claims under the NYCHRL, the Court declines to exercise supplemental jurisdiction. The NYSHRL disability discrimination claim requires separate consideration, because (1) that claim is not time-barred; and (2) a court must determine whether Defendants engaged in a "good faith interactive process" with Plaintiff prior to denying his request for an accommodation. See Van Zant, 80 F.3d at 714 ("Unlike Title VII[ and the ADA's] 300-day rule, the statute of limitations for actions under New York's [State] Human Rights Law is three years."); Jacobsen v. New York City Health & Hosps. Corp., 22 N.Y.3d 824, 837 (2014) (under the NYSHRL and the NYCHRL, an employer "cannot obtain summary judgment . . . unless the record demonstrates that there is no triable issue of fact as to whether the employer duly considered the requested accommodation"). Moreover, discrimination claims under the NYCHRL are subject to a more liberal standard than comparable claims under federal law, and thus must be analyzed separately. See Nunez, 2017 WL 3475494, at *4 (citing Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)). Because "the Court has not yet invested resources necessary to resolve [these] claims," and because "[t]he extensive discovery already taken is likely sufficient to enable [these] claims to be evaluated in state court without any additional discovery," see Vuona, 919 F. Supp. 2d at 393-94, the Court declines to exercise supplemental jurisdiction over these claims. Plaintiff's NYSHRL disability discrimination claim and NYCHRL claims will therefore be dismissed without prejudice.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted as to Plaintiff's (1) disability discrimination claim under the ADA; (2) hostile work environment claims under Title VII, the ADA, and the NYSHRL; (3) retaliation claims under Title VII, the ADA, and the NYSHRL; and (4) FMLA interference claim. These claims are dismissed with prejudice. Plaintiff's NYSHRL disability discrimination claim and NYCHRL claims are dismissed without prejudice. The Clerk of Court is directed to terminate the motion (Dkt. No. 47) and to close this case.

Dated: New York, New York
September 25, 2017

SO ORDERED.

_Paul G. Gardephe_
Paul G. Gardephe
United States District Judge